# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| MICHELLE HERSHBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CV-198-TS |
| | ) | |
| DEBORAH KLINE and BYRON KLINE, | ) | |
| (husband and wife), RICH SNYDER | ) | |
| (named in his individual and official | ) | |
| capacity), SCOTT FLOWERS (named in | ) | |
| his individual and official capacity), THE | ) | |
| TOWN OF LAGRANGE, and JOHN/JANE | ) | |
| DOES (law enforcement officers from the | ) | |
| Town of LaGrange and/or County of | ) | |
| LaGrange), | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On October 14, 2007, Plaintiff Michelle Hershberger and Defendants Deborah and Byron Kline signed a Lease with Option to Purchase (the Lease). The subject of the Lease was a restaurant in LaGrange, Indiana, which the Plaintiff began operating pursuant to the Lease terms under the name "Taste of Country." On the morning of July 3, 2008, the Klines, claiming that the Plaintiff was in default of the Lease, took control of the premises and the operation of the restaurant. The Plaintiff believed that the Klines's actions constituted an unlawful eviction, and she demanded that the Klines leave the restaurant. Local law enforcement officers were called to the restaurant. Town Marshal Rich Snyder and LaGrange County Sheriff Deputies Ed Flowers and Stephanie Leslie responded, but they did not remove the Klines from the restaurant. The Plaintiff has sued the Klines and the responding officers, alleging that Marshal Snyder and the Deputies "permitted the Klines to raid the restaurant, evict the Plaintiff, and allow[ed] the Klines

to take over the restaurant, all in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 and § 1985." (Compl. ¶ 3, ECF No. 1.) The Plaintiff has also sued the Town of LaGrange and the LaGrange County Sheriff under the tort laws of the State of Indiana, as well as the Klines for conspiracy under § 1985 and for violations of state law.

On July 9, 2010, Defendant Flowers and John Does/Jane Does Law Enforcement Officers from the County of LaGrange (the County Defendants) moved for summary judgment with respect to all claims filed against them. This Motion became moot when the Plaintiff and the County Defendants filed a Stipulation [ECF No. 79] for the dismissal of the Plaintiff's claims against these Defendants with prejudice and when the Court granted the Stipulation [ECF No. 81] and dismissed the claims against the County Defendants with prejudice.

On July 15, Defendants Rich Snyder and the Town of LaGrange (the Town Defendants) filed a Motion for Summary Judgment, Memorandum of Law in Support, and Designation of Evidence. On October 18, the Plaintiff filed a Response to the Town Defendant's Motion for Summary Judgment, and on November 29 the Town Defendants filed a Reply in Support of their Motion. On December 15, the Plaintiff filed a Sur-Response to the Defendants' Reply to address the Defendants' assertion that the record was devoid of evidence that Snyder was the highest ranking law enforcement official for the Town of LaGrange. On January 13, 2011, the Defendants filed their Sur-Reply in Support of Motion for Summary Judgment, arguing that the Plaintiff had waived her argument against the Town and Snyder in his official capacity by failing to cite factual support for it in her response brief.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). According to Rule 56,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view

all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

On October 14, 2007, the Plaintiff entered into the Lease with the Klines. The Klines agreed to lease a restaurant located at 202 S. Detroit Street in LaGrange, Indiana, to the Plaintiff beginning on October 15 and terminating on or before September 30, 2009, for payment of $2000 per month. The Lease also contained an option to purchase the restaurant. According to the terms of the Lease, if the Plaintiff paid the agreed rent and was in compliance with the stipulations set forth in the Lease, she was entitled to possession of the restaurant without any interruption by the Klines. The Plaintiff agreed, among other things, to "surrender [the restaurant] upon the termination of the lease, for any cause, in as good condition as received, ordinary wear and tear excepted, unless the [Plaintiff's] option to purchase . . . is exercised and closed." (Lease ¶ 4(f), ECF No. 48-2.) The Plaintiff also agreed to the following:

> That if any default shall be made in the payment of rent or any part thereof at the time provided, or if after ten (10) days written notice setting forth the default, default shall continue by the [Plaintiff] in the performance or observance of any other covenant, agreement, or condition herein contained to be performed on his

part, the [Klines] shall have the right to re-enter and take possession of the premises and the [Plaintiff] will peacefully surrender possession thereof to the [Klines] upon written demand, and all rights and interests of the [Plaintiff] hereunder shall cease and terminate.

(Lease, ¶ 4 [sic].)[1] An amendment to the Lease was executed on December 21, 2007, to reduce the monthly rent payment from $2000 to $1300.

From October 27, 2007, to July 2, 2008, the Plaintiff operated the restaurant. On the evening of July 2, 2008, the Plaintiff attempted to enter the restaurant, but her key did not work in the restaurant locks. The following morning, one of the Plaintiff's daughters told the Plaintiff that when she arrived for work at the restaurant, the Klines informed her that they were taking over control of the restaurant and that she no longer had a job at the restaurant.

Upon learning that the Klines were operating the restaurant, the Plaintiff and her husband drove to see an attorney. The Plaintiff showed the lawyer the Lease, and he wrote a letter on the Plaintiff's behalf that she could give to the Klines. The letter advised that attorney Andrew Rogness represented the Plaintiff and that the Lease "may contain a right of 'self-help', but I strongly suggest that you contact legal counsel, inasmuch as you have to go to Court to get a judgment evicting her from that premises before you can take possession." (Letter, ECF No. 48-7.) The letter stated that the Plaintiff did not voluntarily surrender the premises and that if the Klines made any further entry into the restaurant, a criminal trespass complaint would be filed. As the Plaintiff drove to the restaurant with her attorney's letter in hand, she called the Sheriff's Department to tell them that she was on her way to the restaurant and that things could possibly escalate. (Pl. Dep. 71.) The Plaintiff intended to confront the Klines and tell them that they did

---

[1] The Lease contains two paragraphs numbered as 4. This paragraph concerning default and re-entry should have been number 5.

not have a legal right to take over the restaurant. A police dispatch for disorderly conduct, loud noise, and possible battery was also issued at this time. This dispatch was generated after Mike Kline contacting the police because the Plaintiff's daughter, Kelli, tried to remove menus from the restaurant, and an argument ensued.[2]

When the Plaintiff and her husband arrived at the restaurant, she met Kelli coming out of the restaurant in tears. Snyder and members of the Sheriff's Department were also just arriving. They listened to the Plaintiff's complaints about the Klines and Kelli's complaint that Deborah Kline had pushed her into a counter top after she tried to remove her mother's menus from the restaurant. A sheriff deputy checked Kelli's back for injuries, but Kelli denied medical treatment. Meanwhile, the Plaintiff's husband had entered the restaurant. When he returned outside, he reported that the Klines were not willing to vacate. The Klines also provided a handwritten letter that stated, "As of July 2nd, 2008, you are in default of your lease agreement with Byron and Deb Kline on the Taste of Country Restaurant." (Pl.'s Dep. 55, ECF No. 48-3.) The Plaintiff again called her attorney and kept him on the phone for the remainder of her interaction with law enforcement and the Klines. Upon his advice, she approached Officer Flowers and told him that she wanted the Klines to leave the premises or she would file criminal trespassing charges. Officer Flowers indicated that he could not take any action.

The Plaintiff then asked Snyder to accompany her into the restaurant, and he agreed as long as the Plaintiff entered first and asked for his assistance. Once inside, the Plaintiff asked Deborah Kline to vacate the premises or she would file criminal trespass charges. When the

---

[2] It is not clear from the record whether the Plaintiff's telephone call resulted in a separate dispatch from the one that resulted from Mike Kline's call.

Klines refused to leave, the Plaintiff left the restaurant and told Snyder that she wanted to file criminal charges. The Plaintiff maintains that Snyder was confused as to what action to take, so she indicated that she was going to go back into the restaurant to run her business. Snyder then told her that if she did that, she would be arrested for disorderly conduct.[3] However, Snyder wanted to obtain the prosecutor's guidance regarding what action the police could take, and he walked to his nearby office to show him the Lease.[4] The prosecutor told Snyder that possession of the restaurant was a civil matter, that both parties had an interest in the restaurant, and that it was not for the police department to determine who was the rightful possessor. When Snyder spoke to the Plaintiff, he pointed to the self-help and voluntary surrender provisions of the Lease as the reason he could not do anything to remove the Klines. Snyder had no court orders or other documents indicating who had rightful possession of the restaurant.

The Plaintiff's lawyer advised the Plaintiff to talk to State Police Officer Jeff Boyd. The Plaintiff drove to Officer Boyd's office and explained the situation with the Klines and that she wanted her restaurant back. Officer Boyd said that a civil lawsuit would be the best way to accomplish that goal. A week or two later, the Plaintiff went to see Snyder again to ask if she could remove items from the restaurant. Snyder advised the Plaintiff against doing so, and when she questioned what might happen, he said that she could be arrested for disorderly conduct and perhaps trespassing.

Before July 2, 2008, the Plaintiff had not received any notice from the Klines that she

---

[3] Snyder denies making this statement or any statement indicating that the Plaintiff faced possible arrest, but the Court views the facts in a light most favorable to the Plaintiff.

[4] The Plaintiff maintains that Snyder sought input from the prosecutor several times during the morning. The exact sequence of events, including when Snyder first went to the prosecutor's office, is not clear from the record before the Court.

was in default on the Lease, and she did not owe them any money for rent.


# ANALYSIS

**A.    Section 1983 Claim Against Town Marshal Snyder**

The Plaintiff frames her case as one alleging "forcible eviction" from her restaurant, and she claims that Snyder violated her rights when he assisted in this forcible eviction and aided the Klines, who she asserts were trespassers. (Pl.'s Answer Br. 1–2, ECF No. 69.) The Plaintiff argues that any reasonable police officer could have ascertained by reading the Lease that the Plaintiff was the rightful property owner[5] and that the Klines were trespassers whom the police should have ordered to leave. She argues that Snyder violated the Plaintiff's Fourth and Fourteenth Amendment rights when he told her that she would be arrested for disorderly conduct if she went back into the restaurant. Snyder counters that the Klines were already in possession of the restaurant when he arrived and that he did not conspire or act in concert with the Klines to evict the Plaintiff. He claims that he properly declined to force the Klines to leave, to bring criminal charges against the Klines, or to otherwise intervene in the civil matter.

To prevail on a § 1983 claim, a plaintiff must show that she was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate: (1) a state official and private individuals reached an understanding to deprive a plaintiff of her

---

[5] The Court assumes that the Plaintiff intended to argue that she was the rightful possessor, as it was the Klines who owned the property and were leasing it to the Plaintiff.

constitutional rights; and (2) that those individuals were willful participants in joint activity with the state agents. *Id.* (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)).

Governmental actors performing discretionary functions are entitled to qualified immunity and are shielded from liability, unless the plaintiff can show a violation of a constitutional right and, if successful in showing a constitutional violation, demonstrate that the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). This analysis turns on whether a reasonable officer would have known that his actions were unconstitutional. *Id.* at 202. The purpose of the doctrine is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). When confronted with a claim for qualified immunity, a court must address two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right; and (2) whether the right was clearly established. *Id.*; *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). The court may address these prongs in whichever order is best suited to the circumstances of the particular case. *Pearson*, 129 S. Ct. at 818; *McAllister*, 615 F.3d at 881. For a right to be clearly established, its "'contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *McAllister*, 615 F.3d at 884–85 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted)). "As long as 'officers of reasonable competence could disagree on the issue, immunity should be recognized.'" *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (brackets omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341

(1986)). In ascertaining whether a right is clearly established, this Court looks to controlling Supreme Court and Seventh Circuit precedent, *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009), and the Plaintiff bears the burden of demonstrating the violation of a clearly established right, *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010).

The Plaintiff maintains that her continued possession of the restaurant was a possessory interest protected against state action and that it should have been obvious to Snyder that she was the rightful possessor of the restaurant. Snyder does not dispute that the Plaintiff had a possessory interest in the restaurant or that a seizure occurred. He argues that it was the Klines, not he, who seized the Plaintiff's property and denied her the continued use of the restaurant, and that their activity cannot be imputed to him. The Plaintiff argues that Snyder is responsible because he acted in concert with the Klines. She asserts that "[w]hen a police officer is involved in a private party's repossession of property, there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." (Pl.'s Answer Br. 8.) The Plaintiff finds support for this legal proposition in *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005), *Meyers v. Redwood City*, 400 F.3d 765, 771 (9th Cir. 2005), *Marcus v. McCollum*, 394 F.3d 813, 818–19 (10th Cir. 2004), and *Dixon v. Lowery*, 302 F.3d 857, 864 (8th Cir. 2002).

The Defendant asserts that the cases cited by the Plaintiff are distinguishable because the Klines's repossession was complete before Snyder became involved and that *Pepper v. Village of Oak Park*, 430 F.3d 805 (7th Cir. 2005), provides the proper analysis for the facts of this case. In *Pepper*, the plaintiff's estranged husband removed a television from her dwelling and damaged her couch while she was not at home. The plaintiff sued a police officer who stood

outside the house during her husband's seizure on a theory that he was sufficiently connected to her husband and his activities to transform his private seizure into a public seizure. The plaintiff's claim was unsuccessful because she was unable to establish state action. The court noted that, to be liable under § 1983, an individual must have "'caused or participated in a constitutional deprivation.'" *Pepper*, 430 F.3d at 810 (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)). The *Pepper* court distinguished the case from *Soldal v. County of Cook*, 923 F.2d 1241 (7th Cir. 1991), *reh'g granted*, *Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir. 1991) (en banc), *rev'd on other grounds,* 506 U.S. 56, 61 (1992), where the court had found sufficient evidence of a conspiracy between private parties and deputy sheriffs to make the private parties' forcible removal of the plaintiff's trailer home an action under state law. *Soldal*, 923 F.2d at 1247. In concluding that the circumstances in *Pepper* did not give rise to a conspiracy or any state action, the court first noted that there was no implication that, without the defendant officer's presence, the husband would have been too afraid to take and vandalize the plaintiff's property. *Pepper*, 430 F.3d at 810. By comparison, the evidence in *Soldal* was that the landlord was too afraid of the plaintiff's resistance to evict him without the presence of the deputies. 430 F.3d at 810. Second, the *Pepper* court noted that there was no evidence that the defendant officer facilitated, approved, condoned, or turned a blind eye to activity that he knew was unlawful. *Id.* at 811 (holding that the plaintiff had to show more than negligence). Rather, the defendant officer took appropriate measures to eliminate suspicion that the husband was up to no good before he concluded that the husband was the rightful owner of the property and had lawful access to the residence. This too distinguished the *Pepper* case from *Soldal*, where the deputies, who were highly experienced in evictions and the necessity of a court order

accompanying any eviction, nevertheless allowed an eviction to proceed without a court order. *Id.* Finally, no circumstantial evidence permitted an inference as to the existence of a conspiracy. The husband called dispatch, not the defendant officer. Therefore, the earliest point at which a conspiracy could have been hatched was when the defendant officer arrived at the residence. *Id.* But nothing in the record suggested that they concocted a plan by which the defendant officer would help the husband steal and vandalize the plaintiff's property with no benefit accruing to the defendant. *Id.* Further, nothing in the record contradicted the defendant's stated purpose for being at the house, which was to prevent any outbreak of violence between estranged spouses. *Id.*

Here, there is no direct or circumstantial evidence of a conspiracy between Snyder and the Klines. No reasonable finder of fact could infer that the Klines were afraid to act on their own without the police. To the contrary, the evidence is that the Klines changed the locks and took over possession of the restaurant entirely on their own without the aid of police and before any officers were called or dispatched to the restaurant. The arrival of law enforcement did not appear to cause the Klines to act any more boldly than they would have acted without the police present. Even after the Plaintiff entered the restaurant and threatened to file criminal trespassing charges against the Klines, they continued operating the restaurant and remained adamant in their refusal to leave, relying on language in the Lease to justify their actions. Although Mr. Kline called the police, the evidence is that he did so in an attempt to keep peace and order, not to help him maintain possession of the restaurant. The Seventh Circuit has instructed that "[m]erely calling police to the scene of possible violence does not create a conspiracy." *Pepper*, 430 F.3d at 811; *see also Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 262 (7th Cir. 1999)

("The agreement may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives.").

Additionally, when Snyder responded to the police dispatch for disorderly conduct and loud noise, he had not spoken to the Klines and had not heard the content of the call to dispatch. The record is devoid of any evidence that the Klines were aware that Snyder would be one of the officers to respond. Therefore, similar to *Pepper*, the earliest point at which a conspiracy could have been hatched between Snyder and the Klines was when Snyder arrived at the restaurant. Nothing in the record before this Court suggests that Snyder and the Klines developed a plan to prevent the Plaintiff from taking action to possess the restaurant. When Snyder arrived, he investigated the disturbance by listening to Kelli's complaints about being pushed by Deborah Kline. Upon the Plaintiff's request, Snyder entered the restaurant with the Plaintiff. When presented with the Lease and the Plaintiff's request that he file criminal charges against the Klines, he attempted to find out what action, if any, he could take by consulting with the prosecutor's office. He was told that possession of the property was a civil matter, that both parties had an interest in the property, and that it was not for the police to determine the outcome. These facts do not support a conclusion that Snyder had the requisite state of mind to participate in an unconstitutional seizure.

The Plaintiff argues that the Klines's wrongdoing should have been obvious because the Lease only allowed for repossession upon notice of default and passage of a ten-day cure period. This is an oversimplification of the circumstances presented to Snyder, who had only the opposing claims of the parties to the dispute that they were entitled to possess the restaurant.

Although the Plaintiff argues that she was current with rent payments, that she was not in violation of any other provision, and that no ten day cure period had passed, none of the evidence in the record suggests that Snyder was made aware of these particular facts, either verbally or through documentation. It was possible, given the sparse information available to Snyder, that the Lease term in which the Plaintiff agreed to "surrender [the restaurant] upon the termination of the lease, for any cause, in as good condition as received, ordinary wear and tear excepted, unless the [Plaintiff's] option to purchase . . . is exercised and closed" applied. There was sufficient ambiguity regarding the Lease terms as it related to the parties' actions and rights that would have prevented Snyder from conclusively determining that the Klines were trespassers.

In any event, and more importantly, "law enforcement officers are not the appropriate arbiters" of disputed possessory interests. *See Dixon v. Lowery*, 302 F.3d 857, 866 (8th Cir. 2002). "[O]fficers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." *Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004) (holding that officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor). The Plaintiff argues that Snyder should have ousted the Klines because he did not have any judicial order or directive to evict her from the restaurant, and that his failure to do so extended beyond merely keeping the peace and, instead, supported and aided the Klines's repossession. In making this argument, the Plaintiff overlooks the circumstances that Snyder encountered. The Plaintiff was not in possession of the restaurant when Snyder arrived at the scene. The Klines were inside the building and were operating the

14

business, and thus it was the Plaintiff who was attempting to be the one doing the ousting. It is difficult to see how Snyder could have ousted the Klines without first arbitrating the dispute and then aiding the Plaintiff in a way that her possession would not have occurred but for his assistance. Snyder did not have any court documents that clarified either of the parties' rights or authorized him to remove the Klines and return the property to the Plaintiff. Under these circumstances, it would not have been clear to a reasonable officer in Snyder's position that he should have removed the Klines, thereby allowing the Plaintiff to take back possession of the restaurant from the Klines. To the contrary, absent any neutral determination of property rights, Snyder was correct to refuse the Plaintiff's request to remove the Klines or file criminal trespassing charges against them, and he is entitled to qualified immunity.[6]

Likewise, it would not have been clear to Snyder in light of existing law that his threat to arrest the Plaintiff for disorderly conduct was unlawful.[7] The Plaintiff maintains that after the Klines refused her request to leave, and after Snyder stated that he would not file criminal trespassing charges against the Klines, she expressed that she was going to go back into the restaurant to start running her business. The Plaintiff claims that Snyder told her that if she did

---

[6] The Plaintiff admits that officers must rely on the legal acumen of a neutral judicial officer in the face of property disputes. The Plaintiff argues that Snyder, however, did not remain neutral when he went to the prosecutor for advice because the prosecutor represents the state and state actors. The advice the prosecutor gave to Snyder was that the decision of rightful possession was not for the police to make, but was a civil legal matter. The Plaintiff does not explain how, given the nature of the advice, going to the prosecutor was a failure to remain neutral or failure to leave the decision to a judicial officer. Additionally, the Plaintiff was requesting that Snyder take state action by charging the Klines with criminal trespass. Because it was the prosecutor's office that would, ultimately, have to determine whether there was probable cause to charge the Klines with criminal trespass, it is unclear how obtaining the prosecutor's input violated the Plaintiffs' rights.

[7] Snyder denies making this comment, but at this stage of the proceedings the Court must accept the Plaintiff's version of events.

that, he would arrest her for disorderly conduct. Snyder's statement, in light of the totality of circumstances in this case, does not give rise to a constitutional violation. In *Slodal*, the court noted that the landlord's eviction was unlawful, so Soldal, as the evictee, had a common law right to resist it with mild force. 942 F.2d at 1075. "The deputy sheriffs prevented Slodal from exercising his right, and while this by itself may not have made them actual participants in the eviction, the condition of the record" supported the assumption that there was a conspiracy between the private and public defendants. *Id.* Here, as already discussed, there is no such evidence of a conspiracy. There is no basis to infer that Snyder's statement to the Plaintiff made him a participant in the eviction as opposed to an officer attempting to keep the peace. It was obvious by the time he warned the Plaintiff against going back into the restaurant that the Klines were not going to voluntarily leave the restaurant and that they intended to continue operating it. The Plaintiff had already voiced her demands to the Klines and had given them the letter from her attorney, and their response was to refuse to leave. Under these circumstances, Snyder's comment is consistent with an attempt to maintain peace and leave the issue of rightful possession for another day and venue, specifically a court of law. In addition, it is hard to imagine how the statement amounted to affirmative intervention that altered the outcome of the events related to the Plaintiff's ability to regain control of the restaurant through lawful means. The Klines were not aware of Snyder's threat to arrest the Plaintiff, yet they remained steadfast in their position. Even if Snyder had allowed the Plaintiff to go back inside the restaurant, nothing in the record suggests that she would have been successful in her attempt to regain control, at least absent some level of physical force. Thus, the impact of Snyder's statement was merely to stop the Plaintiff from engaging in a potentially volatile altercation inside the

restaurant. Because the Klines already had possession, preventing the Plaintiff from attempting to assert control and regain possession through these means was not a decision concerning who was the rightful possessor, and it did not constitute a state-assisted eviction. *Cf. Marcus*, 394 F.3d at 820 (noting that because a self-help repossession must not breach the peace, officers can diffuse a volatile situation while ensuring lack of state action if they direct both parties to seek a judicial determination, but that a "curbside courtroom, in which officers decide who was entitled to possession is precisely the situation and deprivation of rights to be avoided") (quotation marks omitted).

The Plaintiff compares her case to the facts in *Dixon v. Lowery*, 302 F.3d 857 (8th Cir. 2002). The Court is not persuaded. In *Dixie*, the uniformed officers arrived at the restaurant at the center of the dispute, the Big Mamou, and stood watch while the person claiming rights superior to the plaintiff's changed the lock and entered the restaurant. The officer then helped the owner clear employees from the restaurant, took possession of the key, locked the premises, and remained there for a period of more than three weeks providing security for the owner. 302 F.3d at 865–66 (stating that the officers "commandeered the facility themselves to the exclusion of the current possessor"). These actions helped effectuate the seizure of the Big Mamou, but Snyder's actions cannot be deemed to have helped effectuate the Klines's seizure of the restaurant.

Because the evidence does not support the existence of any conspiracy between Snyder and the Klines, and because Snyder did not aid the Klines's in their repossession of the property, there was no state action upon which to find Snyder liable under § 1983. Snyder is entitled to summary judgment on the Plaintiff's claim that he violated her constitutional rights.

**B.      Official Capacity Claim**

The Plaintiff has sued Snyder in his official capacity as the Marshal for the Town of LaGrange, asserting that he is the final policy-making authority for the municipality. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) (holding that municipalities and other local governmental units may be sued under § 1983 where the deprivation was caused by the execution of an official policy or custom); *Valentino v. Village of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir. 2009) (stating that a municipality may be liable for a § 1983 violation if, among other things: "(1) it has a permanent and well-settled municipal custom or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury; or (2) an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation"). The Plaintiff's claim against the Town fails as a matter of law because Snyder, the individual whose actions the Plaintiff attempts to impute to the Town, did not violate her constitutional rights. A municipality cannot be held liable under *Monell* when there is no underlying constitutional violation. *Sallenger v. City of Springfield, Ill.*, — F.3d —, 2010 WL 5128850, at *5 (7th Cir. Dec. 17, 2010); *see also Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) (holding that a municipality's liability for a constitutional injury "requires a finding that the individual officer[ ] [is] liable on the underlying substantive claim"); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (quoting *Tesch*); *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) (The "Sheriff's Department cannot be found liable because [the officers'] actions did not constitute, nor did they cause, a constitutional tort."). Because Snyder did not commit any constitutional violation, no

conceivable claim against the Town on the basis of his actions remains, and summary judgment in favor of the Town is appropriate.

## C. State Law Claims

In her Complaint, the Plaintiff states that she is suing the Town of LaGrange under the tort laws of the State of Indiana. Officer Snyder and the Town of LaGrange assert immunity under the Indiana Tort Claims Act (ITCA), specifically Indiana Code § 34-13-3-3(8), which provides that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . (8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." Although the issue of an actor's immunity from liability under the ITCA may, at times, require factual development, the issue remains a question of law for the courts. *Miller v. City of Anderson*, 777 N.E.2d 1100 (Ind. Ct. App. 2002).

In determining whether § 34-13-3-3(8) provides immunity for a police officer, a court must first determine whether the office was acting within the scope of his employment when the injury to the plaintiff occurred. *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010). "An employee's scope of employment consists of activities involving the pursuit of the governmental entity's purpose." *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 483 (Ind. 2003). The second inquiry is whether the officer was engaged in the enforcement of law at that time. *Harness*, 924 N.E.2d at 165. Even if the Klines wrongfully evicted the Plaintiff and repossessed the restaurant, and even if Snyder's failure to charge the Klines with criminal trespass or failure to allow the Plaintiff to take matters into her own hands without the threat of arrest was an

actionable tort, i.e., negligent, Snyder may still be immune from liability. *Id.* at 166. The *Harness* court reasoned:

> To exempt negligent acts from immunity under the Act, the explicit purpose of which is to shield government entities from liability for losses resulting from the performance of various governmental functions, would render the act largely meaningless. It is, after all, the Tort Claims Act. Indeed, police officers may be immune when their conduct is intentionally tortious.

*Id.* (quoting *City of Anderson v. Davis* 743 N.E.2d 359, 365 (Ind. Ct. App. 2001)). "[A] police officer's performance of his duties in an otherwise illegal manner does not necessarily take those activities outside the scope of his employment or beyond the realm of law enforcement." *Id.* (citing *Davis*, 743 N.E.2d at 365 n.4). For example, in *Minks v. Pina*, 709 N.E.2d 379, 383 (Ind. Ct. App. 1999), the Indiana Court of Appeals determined that immunity was proper when two police officers stopped an intoxicated motorist and decided not to arrest or detain him because it would have taken too much time to process the required paperwork. The court held that, even though the officers' conduct was "egregious," their actions fell within the scope of enforcing or failing to enforce the law, and therefore they were entitled to statutory immunity. *Id.* at 382.

The Plaintiff claims that immunity does not apply because "[t]here was no law being enforced," only the "wrongful taking of property." (Pl.'s Answer Br. 12, ECF No. 69.) The Plaintiff does not attempt to and, in fact, cannot distinguish her case from *Harness*, in which summary judgment was granted to a police officer who accompanied a private citizen during a potentially wrongful eviction. The *Harness* court concluded that the police officer was not acting outside the scope of his duties when he agreed to accompany a contractor to a house to evict the occupant, remove property, and change the locks. *Id.*, 924 N.E.2d at 167 ("We decline to hold an officer's presence at a place where a breach of peace might be anticipated is, as a matter of law,

outside the definition of 'law enforcement.'"). Likewise, here, Snyder was acting within the scope of his employment when he responded to a dispatch for disorderly conduct and loud noise and arrived at the site of a property dispute. Police departments are, among other things, required to preserve the peace, prevent offenses, and enforce laws. *See* Ind. Code § 36-8-3-10(a). But for the dispatch for disorderly conduct (or in response to the Plaintiff's call anticipating that matters between her and the Klines could escalate), Snyder would not have been at the restaurant. When Snyder advised the Plaintiff that she would be arrested for disorderly conduct if she went back inside the restaurant to run her business, he was "attempt[ing] to compel the obedience of another to laws." *See Mullin v. Mun. City of South Bend*, 639 N.E.2d 278, 283 (Ind. 1994) (defining "enforcement" as used in the immunity provision of ITCA). When Snyder refused to charge the Klines with criminal trespass or oust them from the restaurant he was, according to the Plaintiff, failing to enforce a law. In other words, she claims that he was failing to compel the obedience of another to laws. *See St. Joseph County Police Dept. v. Shumaker*, 812 N.E.2d 1143, 1150 (Ind. Ct. App. 2004) (reasoning that because enforcement for purposes of tort immunity means compelling or attempting to compel the obedience of another to laws, it also, "by the plain meaning of the statute, include[s] the failure to do such"). Accordingly, Snyder and the Town are immune from suit under the ITCA, and the Plaintiff's state law claims against them will be dismissed.

**D.      Claims against John Does/Jane Does Town of LaGrange Law Enforcement**

In paragraph 5 of the Plaintiff's First Amended Complaint, she asserts that other law enforcement officers for either the Town of LaGrange or LaGrange County Sheriff's

Department, whom she identified as "John Does/Jane Does" violated her right when they

> conspired with and aided and abetted with the Klines in allowing and permitting
> them to take control of the restaurant from the Plaintiff and otherwise permitted in
> the unlawful and unconstitutional seizure of property, wrongful taking of property
> and/or seizure/taking of property [which] violated the substantive due process
> provision of the Fourteenth Amendment of the United States Constitution.

(Pl.'s First Am. Compl. ¶ 5.) She claims that they are thus liable to her under 42 U.S.C. § 1983

and § 1985. The John Does/Jane Does associated with the County of LaGrange have already

been dismissed pursuant to a stipulation.

Since first filing this lawsuit on July 23, 2009, the Plaintiff has not identified the John or

Jane Does. Discovery closed on June 16, 2010. Moreover, the statement of facts presented by the

parties in their summary judgment briefing does not suggest that any officers from the Town of

LaGrange accompanied Snyder to the restaurant. Thus, the Court finds that the dismissal of

John/Jane Does for the Town of LaGrange is appropriate.


## CONCLUSION

For the foregoing reasons, the Town Defendants' Motion for Summary Judgment [ECF

No. 49] is GRANTED. Defendants John/Jane Does Officer for the Town of LaGrange are

dismissed. The Plaintiff's claims against the Klines, which are not the subject of this Opinion

and Order, remain pending. A telephonic status conference regarding the remaining claims is set

for Monday, March 14, 2011, at 11:00 AM. The Court will initiate the call.

SO ORDERED on March 1, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT